**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| CHARLES COFER AND AMY COFER,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>SECURE CASH SYSTEMS, LLC D/B/A SCS PRIVATE FUNDING; RAY MCNEIL; LINDA KIRKLAND; AMERICAN EAGLE CONSULTANTS, INC; ARTHUR GEISS; SCOTT O'NEIL; GAYLIN WARE; TOTAL CHOICE CORPORATION; KENNETH ENRICO; THE ENRICO CORP; and DOE DEFENDANTS 1-5,<br><br>　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　CIVIL ACTION FILE<br>　NO.<br><br>　_____ |

## COMPLAINT

Plaintiffs Charles and Amy Cofer (the "Cofers" or "Plaintiffs") file this Complaint against Defendants Secure Cash Systems, LLC ("SCS"), Ray McNeil, ("McNeil"), Linda Kirkland ("Kirkland"), American Eagle Consultants, Inc. ("American Eagle"), Arthur Geiss ("Geiss"), Scott O'Neil ("O'Neil"), Gaylin Ware ("Ware"), Total Choice Corporation ("Total Choice"), Kenneth Enrico ("Enrico"), and The Enrico Corp ("TEC"), and Doe Defendants 1-5 (collectively "Defendants") alleging causes of action for breach of contract under Georgia law; residential mortgage fraud pursuant to O.C.G.A. § 16-8-102; fraud pursuant to

**1**

Georgia law; conspiracy to commit fraud pursuant to Georgia law; Racketeer Influenced and Corrupt Organizations pursuant to 18 U.S.C. § 1962; unjust enrichment pursuant to Georgia law; *quantum meruit* pursuant to Georgia law; violation of the Fair Business Practices Act pursuant to O.C.G.A. § 10-1-390; violation of the Uniform Deceptive Trade Practices Act pursuant to O.C.G.A § 10-1-370; and causes of action for attorney's fees, expenses, and the costs of litigation.

## JURISDICTION AND VENUE

### 1.

Plaintiffs' claim arises, in part, from a federal RICO claim pursuant to 18 U.S.C. § 1962.  The RICO statute dictates, "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court." Therefore, this Court's subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964. Subject matter jurisdiction for all other claims exists pursuant to 28 U.S.C. § 1367.

### 2.

Venue is proper within the Northern District of Georgia pursuant to 18 U.S.C. § 1965 and 28 U.S.C. §1391 because such action may be brought in the district in which the defendant resides, is found, has an agent or transacts his affairs. Venue is proper for the additional defendants pursuant to 18 U.S.C. § 1965

because the ends of justice require that other parties residing in any other district be brought before this Court.

3.

All of the Defendants are individually subject to the personal jurisdiction of this Court.

4.

Any applicable statute of limitation has been tolled by Defendants' joint and concerted efforts to conceal Defendants' collective actions, including (without limitation) Defendants' fraud.

**PARTIES**

5.

Plaintiffs Charles and Amy Cofer are and were, at all relevant times, citizens of the United States and residents of the State of Georgia, Fayette County.

6.

Defendant Secure Cash Systems, LLC is and was, at all relevant times, a for-profit corporation organized and existing under the laws of the state of Florida, but not registered with the Georgia Secretary of State to transact business in the State of Georgia although it did transact business in Georgia; is one of the entities who was obligated to secure private funding for the Cofers' purchase of the Property in exchange for the Fee and an active participant in the fraud and conspiracy

**3**

perpetrated against the Cofers; entered into a loan application with the Cofers in exchange for the Fee; and may be served with process (a) by serving officer Arthur Geiss at 3161 Bradford Ct. Marietta, GA 30062 or (b) by serving Scott O'Neil at 9654 A North Kings Highway, Suite 311, Myrtle Beach, SC 29582 or (c) registered agent James G. Kosmatka at 7677 W. Lake Pointe Drive, Franklin, WI 53132. SCS's registered agent for service of process in Florida, Howard Milchman, is deceased.

7.

Defendant Ray McNeil is and was, at all relevant times, a citizen of the United States and resident of the State of Georgia, Newton County; is one of the entities who was obligated to secure private funding for the Cofers' purchase of the Property in exchange for the Fee and an active participant in the fraud and conspiracy perpetrated against the Cofers; and may be served with process at his residence at 185 Shadowbrook Trace, Covington, GA 30016 or at his place of business at 155 Westridge Parkway, Suite 307, McDonough, Georgia 30253.

8.

Defendant Linda Kirkland is and was, at all relevant times, a citizen of the United States and resident of the State of Florida, Clay County; is one of the individuals who was obligated to secure private funding for the Cofers' purchase of the Property in exchange for the Fee and an active participant in the fraud and

conspiracy perpetrated against the Cofers; is a member of Secure Cash Systems, LLC; and may be served with process at 165 Wells Road #409, Orange Park, FL 32073.

9.

Defendant American Eagle Consultants, Inc. is and was, at all relevant times, a for-profit corporation organized and existing under the laws of the state of Georgia and registered and transacting business in the State of Georgia; is one of the entities who was obligated to secure private funding for the Cofers' purchase of the Property in exchange for the Fee and an active participant in the fraud and conspiracy perpetrated against the Cofers; entered into a loan application with the Cofers in exchange for the Fee; and may be served with process through its registered agent, William Edward Smallwood, II at 1827 Powers Ferry Road, Suite #200, Atlanta, GA 30339.

10.

Defendant Arthur Geiss is and was, at all relevant times, a citizen of the United States and resident of the State of Georgia, Cobb County; is one of the individuals who was obligated to secure private funding for the Cofers' purchase of the Property in exchange for the Fee and an active participant in the fraud and conspiracy perpetrated against the Cofers; is a member of Secure Cash Systems,

LLC; and may be served with process at 3161 Bradford Court, Marietta, GA 30062.

11.

Defendant Scott O'Neil is and was, at all relevant times, a citizen of the United States and resident of the State of South Carolina, Horry County; is one of the individuals who was obligated to secure private funding for the Cofers' purchase of the Property in exchange for the Fee and an active participant in the fraud and conspiracy perpetrated against the Cofers; is a member of Secure Cash Systems, LLC; and may be served with process at 9654 A North Kings Highway, Suite 311, Myrtle Beach, SC 29582.

12.

Defendant Gaylin Ware is and was, at all relevant times, a citizen of the United States and resident of the State of Georgia, Henry County; is an active participant in the fraud and conspiracy perpetrated against the Cofers; and may be served with process at 155 Westridge Parkway, Suite 307, McDonough, GA 30253.

13.

Defendant Total Choice Corporation is and was, at all relevant times, a for-profit corporation organized and existing under the laws of the state of Georgia and registered and transacting business in the State of Georgia; is an active participant in the fraud and conspiracy perpetrated against the Cofers; and may be served with

process by serving its registered agent, Michelle Gibson, at 4197 Merle Court, McDonough, Georgia  30252 or by serving officer Gaylin Ware at 155 Westridge Parkway, Suite 307, McDonough, GA 30253.

14.

Defendant Kenneth Enrico is and was, at all relevant times, a citizen of the United States and resident of the State of New York, Suffolk County; is one of the individuals who was obligated to secure private funding for the Cofers' purchase of the Property in exchange for the Fee and an active participant in the fraud and conspiracy perpetrated against the Cofers; and is the sole shareholder of The Enrico Corp; and may be served with process at 30 Westgate Drive, Apartment 7, Bohemia, NY 11716-3917.

15.

Defendant The Enrico Corp is and was, at all relevant times, a for-profit corporation that is not organized and existing under the laws of the state of Georgia or registered with the Georgia Secretary of State to transact business in the State of Georgia although it did transact business in Georgia; is one of the entities who was obligated to secure private funding for the Cofers' purchase of the Property in exchange for the Fee and an active participant in the fraud and conspiracy perpetrated against the Cofers; and may be served with process by serving Kenneth Enrico at 30 Westgate Drive, Apartment 7, Bohemia, NY 11716-3917.

16.

Doe Defendants 1-5 are and were, at all relevant times, citizens of the United States; are as-yet unidentified individuals or entities that actively participated in and/or materially benefitted from the fraud and/or conspiracy to commit fraud perpetrated by the Cofers; and will be substituted with the proper names of these individuals and/or entities as they become available.

**RELATIONSHIP AMONG THE DEFENDANTS**

17.

At all times relevant to this matter, American Eagle was an authorized agent for SCS.   However, due to the knowingly and intentionally fraudulent nature of their actions, each has separate and individual liability to the Cofers.

18.

At all times relevant to this matter, SCS was an authorized agent for Kenneth Enrico and The Enrico Corp.   However, due to the knowingly and intentionally fraudulent nature of their actions, each has separate and individual liability to the Cofers.

19.

At all times relevant to this matter, Ray McNeil and Gaylin Ware were authorized agents for Kenneth Enrico and The Enrico Corp.  However, due to the knowingly and intentionally fraudulent nature of their actions, each has separate and individual liability to the Cofers.

20.

At all times relevant to this matter, Arthur Geiss, Linda Kirkland, and Scott O'Neil were authorized agents for SCS.   However, due to the knowingly and intentionally fraudulent nature of their actions, each has separate and individual liability to the Cofers.

21.

At no time during the events relevant to this action were any of the Defendants a licensed residential mortgage broker.

22.

Each of the Defendants knew at the time of their acting that their activities were illegal and engaged and conspired to engage in a pervasive scheme to defraud the Cofers and hundreds of others of thousands of dollars.

**THE COFERS PAY A FEE AS A RESULT OF DEFENDANTS' FRAUD**

23.

On February 29, 2012, SCS, American Eagle Consultants, Inc., and Ray McNeil solicited and obtained a fee of $3,500 (the "Fee") from the Cofers based on promises and representations to secure private funding for the purchase of that certain real property located at 160 Granby Lane, Fayetteville Georgia 30215 (the "Property").

24.

The Cofers provided the completed loan application to American Eagle and William Edward Smallwood, II of American Eagle on or about February 26, 2012.

25.

During the course of the fraud conspired by and perpetrated by the Defendants in concert, American Eagle and Mr. Smallwood distributed brochures bearing the SCS logo and actively marketed the SCS fraud.  Specifically, American Eagle and Mr. Smallwood provided the Cofers with SCS marketing materials, provided the Cofers with the SCS application, and held themselves out as SCS's authorized agent.   In fact, employees of American Eagle added SCS to the signature of their outgoing e-mails.

## HOW DEFENDANTS' FRAUD WORKED

26.

The Cofers transmitted the Fee to American Eagle and SCS on February 29, 2012.  After being entitled to a commission, American Eagle then forwarded the completed loan application and Fee to Total Choice, Mr. Ware, and Mr. McNeil, who was also entitled to a commission.  Total Choice, Mr. Ware, and Mr. McNeil then forwarded the completed loan application and Fee to SCS, Geiss, Kirkland, and O'Neil, who were also to receive a commission.  SCS, Geiss, Kirkland, and O'Neil then forwarded the completed loan application and Fee to Enrico and The Enrico Corp.

27.

During the pendency of the application, Mr. Ware and Total Choice Corporation conducted fraudulent appraisals as part of the fraud and were active in creating and maintaining the conspiracy to defraud the Cofers and hundreds of others in Georgia.

28.

In response to the Cofers' completed loan application and transmittal of the Fee, Mr. O'Neil sent out a Pre-Approval Letter on SCS letterhead for the Cofers' loan to purchase the property in March 2012.

11

29.

In reliance on the Pre-Approval Letter, the Cofers entered into that certain Contract for Sale of Realty for that certain real property and improvements known as 160 Granby Lane, Fayeteville, Georgia 30215 and paid a $2,000.00 earnest money deposit on or about March 19, 2012. The Cofers agreed to purchase that certain real property for $72,000.00.

**THE DELAY BEGINS**

30.

On May 25, 2012, Mr. O'Neil of SCS transmitted a letter stating that The Enrico Corp. "just informed us that the recent issues with property values and appraisals that caused for delay have been addressed." The letter further stated that an exact closing date would be provided to the Cofers and asked the Cofers not to call SCS.

**THE GEORGIA DEPARTMENT OF BANKING AND FINANCE'S FIRST ORDERS**

31.

On May 29, 2012, the Georgia Department of Banking and Finance issued an Order to Cease and Desist, ordering SCS "to cease and desist from engaging in activities in violation of the Georgia Residential Mortgage Act" because SCS "violated the Act . . . by engaging in residential mortgage originating, brokering

and/or lending activities without a valid license or pursuant to an applicable exemption."

32.

The May 29, 2012 Order was made final on June 28, 2012 and filed on June 29, 2012.

33.

Defendants never made the Cofers aware of the Order to Cease and Desist.

34.

Despite the Order to Cease and Desist, SCS continued to originate, broker, and engage in lending activities for residential mortgages.

35.

On June 5, 2012, the Georgia Department of Bank and Finance issued a similar Order to Cease and Desist to Mr. Ware and Total Choice Corporation.

**THE DEFENDANTS CONTINUE THE FRAUD
AND THEIR EFFORTS TO CONCEAL THE FRAUD**

36.

On June 21, 2012, SCS, through Mr. O'Neil, sent a letter stating, "The updates are almost done and with luck will all be completed tomorrow and sent to the secondary investors attorneys. They have said they will need a couple of days

to review & confirm. At that point the lender will send out closing packages. This will take us into early next week and then the packages will go out."

37.

On June 28, 2012, Mr. O'Neil sent out another letter stating that the Cofers' closing had not occurred because of complications with the appraisal updates - specifically, that "many were sent with a request for additional information." The letter again directed that all communications with SCS be via email.

38.

On June 29, 2012, Mr. O'Neil transmitted a letter stating, "All the obstacles that required the appraisal and title updates have been resolved and today are being sent to the secondary investors." The letter again directed that all communications with SCS be via email.

39.

SCS's address, phone number, and fax number were removed from the letterhead for the June 28, 2012 and June 29, 2012 letters.

40.

At all times relevant to this action, SCS used the following addresses:

3162 Johnson Ferry Road, Suite 260-330; Marietta, Georgia 30062; and

2778 Cumberland Boulevard, SE; Smyrna, Georgia  30080

41.

At all times relevant to this action, American Eagle used the following address:

2778 Cumberland Boulevard, SE, Suite 373; Smyrna, Georgia  30080

42.

Both of these addresses are mailbox stores:

3162 Johnson Ferry Road, Suite 260; Marietta, Georgia 30062; and

2778 Cumberland Boulevard, SE; Smyrna, Georgia  30080

43.

Despite using common addresses at mailbox stores, holding themselves out as SCS's agent, distributing SCS marketing materials, and placing SCS at the bottom of its employees outgoing e-mail signatures, American Eagle claimed only a slight and vague familiarity with SCS to the Cofers.

44.

American Eagle claims that it attempted to distance itself from the fraud and sever ties with SCS in July 2012.

45.

Assuming *arguendo* that American Eagle did in fact, attempt to sever ties with SCS in July 2012, and despite American Eagle and Mr. Smallwood's actual

knowledge of the fraud and the conspiracy against the Cofers and hundreds of others, neither American Eagle nor Mr. Smallwood notified the Cofers of the fraud that both American Eagle and Mr. Smallwood were a part of or refunded the Cofers' Fee until October 2012.

46.

On July 12, 2012, Mr. O'Neil transmitted a written "update" stating, "The lender has informed me that all of the applications and associated properties have gone through final review and approval. This means that all of the obstacles and issues that have previously delayed this process have been resolved. The secondary investors, lawyers and staff will begin preparing all of the loan closing documents at the beginning of the next week."

47.

On July 20, 2012, SCS transmitted a letter blaming the further delay on "valuation issues on some of the files," and stating that the loan packages that were to "go out July 16th and July 17th" were delayed because of the "large volume."

48.

Also on July 20, 2012, Mr. O'Neil transmitted an email to Mr. Smallwood of American Eagle with Mr. Enrico's directions for a refund.

49.

Mr. Enrico's instructions for getting a refund were never transmitted to the Cofers either by SCS, American Eagle, Mr. Geiss, Mr. O'Neil, Ms. Kirkland, or Mr. Smallwood.

50.

Enrico and Enrico Corp. actively participated in the above SCS correspondence, which perpetuated the fraud in which the Defendants participated. American Eagle was aware of the dissemination of the above SCS correspondence, which perpetuated the fraud in which the Defendants participated, but American Eagle remained silent and actively chose not to reveal the fraud to the Cofers and the other Georgia victims

## THE GEORGIA DEPARTMENT OF BANKING AND FINANCE'S SECOND ORDERS

51.

On July 26, 2012, the Georgia Department of Banking and Finance issued a second Order to Cease and Desist, ordering SCS "to cease and deist from engaging in activities in violation of the Georgia Residential Mortgage Act" because SCS "violated the Act . . . by engaging in residential mortgage originating, brokering, and/or lending activities without a valid license or pursuant to an applicable exemption.

52.

The July 26, 2012 Order was made final and filed on August 28, 2012.

53.

None of the Defendants made the Cofers aware of the Order filed on August 28, 2012.

**DEFENDANTS CONTINUE AND CONTINUE TO CONCEAL THE FRAUD**

54.

On July 27, 2012, Mr. O'Neil transmitted another letter promising that the loans would close "on or about the 13th of August," and as concession for the delay, Mr. O'Neil stated that "the lender has reduced the mortgage interest from 4.99% to 3.5% fixed rate 30 year mortgage."

55.

Mr. O'Neil concluded his July 27, 2012 letter by again requesting that the loan applicants not call SCS; "If you need me [sic] one of our staff to talk to your sellers please send an email to linda@scsprivatefunding.com, please refrain from calling we are not equipped to handle calls."

56.

Mr. O'Neil transmitted another letter on July 27, 2012, promising that the loans would close "during the week of August 13, 2012." Despite SCS and Mr. O'Neil's promises, the SCS loans never closed.

57.

On August 9, 2012, Ms. Kirkland of SCS sent Mr. Cofer an email stating, "August 13 is the deadline that the lender has to send out closing packages, not for anyone to close on that date. There are a lot of closing packages going out then in batches of 50 to the agencies doing the closings. Actual closings will be after the 13th."

58.

On August 16, 2012, Ms. Kirkland, with Mr. O'Neil's electronic signature, sent an email to Mr. Cofer stating, "We have been trying very hard, working with the primary lender every day, on getting closing packages out. Today the lender told us that no loan packages are going out this week because they had to replace the secondary lender. So, the new lender has to work through the packages to satisfy their guidelines before allowing any to transmit to closers. The best we are hoping for is a date for next week."

59.

On August 22, 2012, Mr. O'Neil transmitted a letter stating, "HUD statements will be sent out the 6th and 7th of September. Closing documents will be sent out the 10th, 11th, and 12th of September."

60.

Mr. O'Neil concluded the August 22, 2012 letter by again limiting communications with SCS, stating, "Please ask your realtors, sellers, title companies, and attorneys to email support@scsprivatefunding.com. There is no need to cc several people at SCS."

61.

On September 6, 2012, Ms. Kirkland of SCS sent Mr. Cofer an email promising that the loan would close soon: "Per the lender, the HUD statements and closing pkgs./funding are on schedule. We are waiting to hear from the lender on the HUD transmittals. Will advise as soon as I hear update."

62.

On September 12, 2012, SCS sent out another letter stating, "We have been informed by the lender that the documents we were expecting on the 10th, 11th and 12th of this month will not go out until the 28th of September, 2012."

63.

Mr. O'Neil concluded the September 12, 2012 letter by trying to disclaim responsibility for the fraud, stating, "Some of you have confused SCS with the lender. We are not the lender."

64.

Although SCS, Mr. Geiss, Mr. O'Neil, Ms. Kirkland, and others were still promising that the Cofers' loan and others' loans would close, SCS was dissolved on September 28, 2012, according to the records of the Florida Department of State, Divisions of Corporations.

65.

Similar to the earlier correspondence, Enrico and Enrico Corp. actively participated in the above SCS correspondence, which perpetuated the fraud in which the Defendants participated.    American Eagle was aware of the dissemination of the above SCS correspondence, which perpetuated the fraud in which the Defendants participated, but American Eagle remained silent and actively chose not to reveal the fraud to the Cofers and the other Georgia victims

**INDIANA ISSUES A CEASE AND DESIST ORDER**

66.

On October 2, 2012, the Office of the Secretary of State, Securities Division, for the State of Indiana issued a cease and desist order against SCS, Mr. O'Neil, Ms. Kirkland, Ellis Funding Group, Tracey M. Ellis, and Anthony Cory for violations of the Indiana Loan Broker Act and barred each of them from "(1) acting as unlicensed loan brokers; (2) acting as unregistered loan originators; and (2) [sic] engaging in fraud in connection with a contract for the services of a loan broker."

## DEFENDANTS CONTINUE THEIR FRAUD

67.

On October 4, 2012, Mr. O'Neil of SCS sent another letter acknowledging that the Cofers' Fee has been improperly retained: "In a letter dated September 12, 2012, I conveyed to you the lender's announcement that your loan documents would arrive on or before the 28th of September, 2012 or that they would refund you the processing fees. The lender did not send out any loan documents and did not fund any of the loans that were in the batch. . . . To date, we have not received any refunds from the lender, which when received we would forward to you." American Eagle was aware of the dissemination of the the October 4, 2012 letter, which perpetuated the fraud in which the Defendants participated, but American Eagle remained silent and actively chose not to reveal the fraud to the Cofers and the other Georgia victims

## THE FRAUD UNRAVELS

68.

During October 2012, Mr. Geiss began cooperating with the Federal Bureau of Investigations on their investigation of Kenneth Enrico and the Enrico Corp.

69.

Mr. Smallwood and American Eagle became aware of Mr. Geiss' cooperation with the FBI.  Despite their July attempts to distance themselves from the fraud that Defendants conspired to perpetrate and did commit against hte Cofers, Mr. Smallwood and American Eagle maintained their communications with Mr. Geiss and SCS to remain aware of the status of the FBI's investigation into the Defendants' fraud.

70.

Kenneth Enrico is currently under federal indictment in the United States District Court for the Northern District of Georgia in case number 2012R00854 and court docket number 13-CR-00048 as a result of the above fraud.

**THE COFERS' DAMAGES**

71.

As a result of Defendants' conspiracy, the Cofers were unable to purchase the Property.

72.

The Property sold for $147,000.00 in April of 2013.

73.

As a result of Defendants' conspiracy, the Cofers suffered the following damages:

(a)  Loss of the Fee in the amount of $3,500;

(b)  Loss of the earnest money in the amount of $2,000;

(c)  Lost business opportunity in the amount of $75,000; and

(d)  Emotional suffering in an amount to be determined at the time of trial by the enlightened conscience of a jury.

## THE COFERS' DEMAND

74.

Gregory Shenton from the law firm of Shenton & Sonoda, in his capacity as the Cofers' attorney, sent a demand letter to Defendants on May 14, 2013. The letter demanded liquidated damages in the amount of $250,000.00 pursuant to Title 51 of the Georgia Code.

75.

The May 14, 2013 demand letter further stated that if payment was not received within thirty days, the Cofers would pursue their claims in a court of law.

76.

On May 17, 2013 Mr. O'Neil wrote an email to Shenton & Sonoda in response to the demand letter, denying that he "participated in or believed that this was a fraud."

The letter went on to state that Mr. O'Neil was cooperating with the FBI in the investigation of Kenneth Enrico. Mr. O'Neil also admitted that he sent letters consisting of "restatements of what was told to us by Kenneth Enrico, and some of those letters were written after we started cooperating with the FBI."

77.

None of the other Defendants responded to the Demand letter.

78.

The Cofers have satisfied all conditions precedent to filing this suit.

79.

Any statute of limitations have been told by Defendants' fraudulent conduct and Defendants' efforts to conceal the fraud.

## COUNT I
## BREACH OF CONTRACT
## AGAINST SCS AND AMERICAN EAGLE

80.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

81.

A contract existed between Defendants SCS and American Eagle, on the one hand, and the Cofers, on the other hand, in the form of the Loan Application Profile that was signed on February 26, 2012.

82.

The Cofers provided the Fee as consideration in exchange for Defendants SCS and American Eagle's promise to secure private funding.

83.

Under the terms of the contract, Defendants SCS and American Eagle agreed to provide the Cofers with private funding in exchange for the Fee.

84.

Defendants SCS and American Eagle, along with the other Defendants, acted wrongfully when they accepted the Cofers' Fee and did not provide the agreed upon private funding for the purchase of that certain Property.

85.

Defendants SCS and American Eagle have not secured private funding, nor have they returned the Cofers' Fee.

86.

The Cofers have satisfied all conditions required under the contract.

87.

As a direct and proximate result of the conduct of Defendants SCS and American Eagle in keeping the Cofers' Fee and purposefully failing to secure private funding, the Cofers have been damaged in an amount presently unknown but to be set forth at the time of trial, but at least the amount of the Fee ($3,500.00), earnest money deposit

($2,000.00), and lost profits ($75,000.00). In addition the Cofers are entitled to recovery of interest on past due monies.

88.

Substantial evidence exists to support a finding that Defendants SCS and American Eagle breached the agreed upon contract.

**COUNT II**
**RESIDENTIAL MORTGAGE FRAUD**
**AGAINST ALL DEFENDANTS**
**[PURSUANT TO O.C.G.A. § 16-8-102]**

89.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

90.

Defendants knowingly made misrepresentations or omissions during the mortgage lending process when (a) they promised and represented that they would secure private funding for the Cofers' purchase of the Property in exchange for the Fee and (b) when Mr. O'Neil of SCS sent the Cofers a Pre-Approval Letter for the Cofers' loan to purchase the Property with the intent that they be relied on by the Cofers.

91.

Defendants received proceeds in the form of the Fee on February 29, 2012 in connection with a residential mortgage for that certain Property that Defendants knew resulted from the misrepresentations made to the Cofers.

92.

Defendants made a false representations when they promised the Cofers that they would secure private funding for the Cofers' purchase of the Property in exchange for the Fee and when Mr. O'Neil of SCS sent the Cofers a Pre-Approval Letter for the Cofers' loan to purchase the Property. Defendants continued to perpetrate that fraud by sending the following letters, emails, and other documents:

1. Transmission of loan application on February 29, 2012

2. Second transmission of loan application on February 29, 2012

3. Pre-Approval Letter

4. May 25, 2012 letter

5. June 21, 2012 letter

6. June 28, 2012 letter

7. June 29, 2012 letter

8. July 12, 2012 letter

9. July 20, 2012 letter

10. July 20, 2012 email

11. July 27, 2012 letter

12. July 27, 2012 second letter

13. August 9, 2012 email

14. August 16, 2012 email

15. August 22, 2012 letter

16. September 6, 2012 email

17. September 12, 2012 letter

18. October 4, 2012 letter.

93.

Defendants conspired to induce the Cofers to rely on the misrepresentations.

94.

Defendants intended to defraud the Cofers by accepting the Fee and failing to provide private funding to purchase that certain Property.

95.

Substantial evidence exists to support a finding that Defendants knowingly made misrepresentations with the intent to defraud the Cofers in violation of O.C.G.A. § 16-8-102.

96.

As a direct and proximate result of the Defendants' conduct, specifically including, but not limited to, keeping the Cofers' Fee and purposefully failing to secure private funding, the Cofers have been damaged in an amount presently unknown but to be set forth at the time of trial, but at least the amount of the Fee ($3,500.00), earnest money deposit ($2,000.00), and lost profits ($75,000.00). In addition the Cofers are entitled to recovery of interest on past due monies.

97.

The aforementioned conduct of the Defendants was willful, malicious, wanton, oppressive, and/or consciously indifferent to the consequences thereof, thereby entitling the Cofers to recover punitive and exemplary damages from and against each of the Defendants in an amount deemed reasonable by the trier of fact, but in any event not less than Two Hundred Forty-One Thousand, Five Hundred Dollars ($24,500.00), to punish and deter Defendants from such wrongful conduct in the future, pursuant to O.C.G.A. § 51-12-5.1.

## COUNT III
## FRAUD
## AGAINST ALL DEFENDANTS

98.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

99.

Defendants made a false representations when they promised the Cofers that they would secure private funding for the Cofers' purchase of the Property in exchange for the Fee and when Mr. O'Neil of SCS sent the Cofers a Pre-Approval Letter for the Cofers' loan to purchase the Property. Defendants continued to perpetrate that fraud by sending the following letters, emails, and other documents:

1. Transmission of loan application on February 29, 2012

2. Second transmission of loan application on February 29, 2012

3. Pre-Approval Letter

4. May 25, 2012 letter

5. June 21, 2012 letter

6. June 28, 2012 letter

7. June 29, 2012 letter

8. July 12, 2012 letter

9.  July 20, 2012 letter

10. July 20, 2012 email

11. July 27, 2012 letter

12. July 27, 2012 second letter

13. August 9, 2012 email

14. August 16, 2012 email

15. August 22, 2012 letter

16. September 6, 2012 email

17. September 12, 2012 letter

18. October 4, 2012 letter.

100.

Defendants intended to deceive the Cofers when they promised to secure private funding in the agreement entered into on February 26, 2012 as well as with the additional communication to the Cofers via the above mentioned letters and emails.

101.

Defendants intended to induce the Cofers to act by giving Defendants' the Fee in reliance on the false representation that Defendants would secure private funding to purchase that certain Property.

102.

The Cofers justifiably relied on Defendants' false representations when they entered into the agreement and gave Defendants the Fee on February 26, 2012.

103.

As a direct and proximate result of Defendants' conduct, the Cofers have been damaged in an amount presently unknown but to be set forth at the time of trial, but at least the amount of the Fee ($3,500.00), earnest money deposit ($2,000.00), and lost profits ($75,000.00). In addition the Cofers are entitled to recovery of interest on past due monies.

104.

The aforementioned conduct of the Defendants was willful, malicious, wanton, oppressive, and/or consciously indifferent to the consequences thereof, thereby entitling the Cofers to recover punitive and exemplary damages from and against each of the Defendants in an amount deemed reasonable by the trier of fact, but in any event not less than Two Hundred Forty-One Thousand, Five Hundred Dollars ($24,500.00), to punish and deter Defendants from such wrongful conduct in the future, pursuant to O.C.G.A. § 51-12-5.1.

## COUNT IV
## CONSPIRACY TO COMMIT FRAUD
## AGAINST ALL DEFENDANTS

105.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

106.

There existed an express agreement between Defendants to perpetrate a pervasive fraud.

107.

In furtherance of the conspiracy, Defendants engaged in the overt acts of entering into an agreement with the Cofers wherein Defendants promised to secure private funding for the Cofers' purchase of the Property and communicated with the Cofers regarding the promise to secure private funding in at least seventeen separate communications.

108.

Defendants made false representations (a) when they promised the Cofers that they would secure private funding for the Cofers' purchase of the Property in exchange for the Fee and (b) when Mr. O'Neil of SCS sent the Cofers a Pre-Approval Letter for the Cofers' loan to purchase the Property. Defendants continued to perpetrate that fraud by sending the following letters,

emails, and other documents:

1. Transmission of loan application on February 29, 2012

2. Second transmission of loan application on February 29, 2012

3. Pre-Approval Letter

4. May 25, 2012 letter

5. June 21, 2012 letter

6. June 28, 2012 letter

7. June 29, 2012 letter

8. July 12, 2012 letter

9. July 20, 2012 letter

10. July 20, 2012 email

11. July 27, 2012 letter

12. July 27, 2012 second letter

13. August 9, 2012 email

14. August 16, 2012 email

15. August 22, 2012 letter

16. September 6, 2012 email

17. September 12, 2012 letter

18. October 4, 2012 letter.

109.

As a direct and proximate result of Defendants' conduct, the Cofers have been damaged in an amount presently unknown but to be set forth at the time of trial, but at least the amount of the Fee ($3,500.00), earnest money deposit ($2,000.00), and lost profits ($75,000.00). In addition the Cofers are entitled to recovery of interest on past due monies.

110.

The aforementioned conduct of the Defendants was willful, malicious, wanton, oppressive, and/or consciously indifferent to the consequences thereof, thereby entitling the Cofers to recover punitive and exemplary damages from and against each of the Defendants in an amount deemed reasonable by the trier of fact, but in any event not less than Two Hundred Forty-One Thousand, Five Hundred Dollars ($24,500.00), to punish and deter Defendants from such wrongful conduct in the future, pursuant to O.C.G.A. § 51-12-5.1.

**COUNT V**
**UNJUST ENRICHMENT**
**AGAINST ALL DEFENDANTS**

111.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

112.

There was no legal contract between Defendants Ray McNeil, Linda Kirkland, Arthur Geiss, Scott O'Neil, Gaylin Ware, Total Choice Corp., Doe Defendants 1-5, Kenneth Enrico, and The Enrico Corp. and the Cofers.

113.

Plaintiffs assert a claim for unjust enrichment and/or quantum meruit as an alternative count to Count I - Breach of Contract against SCS and American Eagle.

114.

Defendants were conferred a benefit because they took and kept the Fee paid by the Cofers on February 29, 2012 and failed to secure private funding for the Cofers' purchase of the Property as promised by Defendants.

115.

Defendants in equity and good conscience should return or compensate the Cofers for the Fee.

## COUNT VI
## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## AGAINST SCS, AMERICAN EAGLE, THE ENRICO CORP.
## [PURSUANT TO 18 U.S.C. § 1962(b)]

116.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

117.

SCS, American Eagle, and The Enrico Corp. consist of an enterprise engaged in and whose activities affect interstate commerce.

118.

The Count VI Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity.

119.

Defendants engaged in a pattern of racketeering activity by collecting fees in exchange for securing private funding and failing to secure such funding.

120.

Defendants acquired or maintained an interest in, or controlled the enterprise through the pattern of racketeering activity.

121.

Pursuant to and in furtherance of their fraudulent scheme, the Count VI Defendants committed multiple related acts of mail fraud and wire fraud.

122.

It was reasonably foreseeable that interstate mail and wire communications would be used in furtherance of the enterprise's affairs.

123.

The following interstate mail communications were used to defraud the Cofers in violation of 18 U.S.C. § 1341 and constitute predicate acts of racketeering activity under 18 U.S.C. § 1961:

A. Transmission of the Cofers' loan application and Fee by American Eagle and Mr. Smallwood to Mr. Geiss, Ms. Kirkland, and Mr. O'Neil on February 29, 2012.

B. Pre-Approval Letter for the Cofers' loan to purchase the Property sent by Mr. O'Neil of SCS to the Cofers in March 2012.

C. May 25, 2012 letter from Mr. O'Neil of SCS to the Cofers stating that The Enrico Corp. "just informed us that the recent issues with property values and appraisals that caused for delay have been addressed." The letter further stated that an exact closing date would be provided to the Cofers and asked the Cofers not to call SCS.

D. June 21, 2012 letter from Mr. O'Neil of SCS to the Cofers stating, "The updates are almost done and with luck will all be completed tomorrow and sent to the secondary investors attorneys. They have said they will need a couple of days to review & confirm. At that point the lender will send out closing packages. This will take us into early next week and then the packages will go out."

E. June 28, 2012 letter from Mr. O'Neil to the Cofers stating that the Cofers' closing had not occurred because of complications with the appraisal updates - specifically, that "many were sent with a request for additional information." The letter again directed that all communications with SCS be via email.

F. June 29, 2012 letter from Mr. O'Neil to the Cofers stating, "All the obstacles that required the appraisal and title updates have been resolved and today are being sent to the secondary investors." The letter again directed that all communications with SCS be via email.

G. July 12, 2012 letter from Mr. O'Neil to the Cofers with a written "update" stating, "The lender has informed me that all of the applications and associated properties have gone through final review and approval. This means that all of the obstacles and issues that have previously delayed this process have been resolved. The secondary investors, lawyers and staff will begin preparing all of

**40**

the loan closing documents at the beginning of the next week."

H. July 20, 2012 letter from SCS to the Cofers blaming the further delay on "valuation issues on some of the files," and stating that the loan packages that were to "go out July 16th and July 17th" were delayed because of the "large volume."

I. July 27, 2012 letter from Mr. O'Neil to the Cofers promising that the loans would close "on or about the 13th of August," and as concession for the delay, Mr. O'Neil stated that "the lender has reduced the mortgage interest from 4.99% to 3.5% fixed rate 30 year mortgage." Mr. O'Neil concluded his July 27, 2012 letter by again requesting that the loan applicants not call SCS; "If you need me [sic] one of our staff to talk to your sellers please send an email to linda@scsprivatefunding.com, please refrain from calling we are not quipped to handle calls."

J. Second July 27, 2012 letter from Mr. O'Neil to the Cofers, promising that the loans would close "during the week of August 13, 2012."

K. August 22, 2012 letter from Mr. O'Neil to the Cofers stating, "HUD statements will be sent out the 6th and 7th of September. Closing documents will be sent out the 10th, 11th, and 12th of September."

L. September 12, 2012 letter from SCS to the Cofers stating, "We have been informed by the lender that the documents we were expecting on the 10th,

11th and 12th of this month will not go out until the 28th of September, 2012."

M. October 4, 2012 letter from Mr. O'Neil of SCS to the Cofers acknowledging that the Cofers' Fee has been improperly retained: "In a letter dated September 12, 2012, I conveyed to you the lender's announcement that your loan documents would arrive on or before the 28th of September, 2012 or that they would refund you the processing fees. The lender did not send out any loan documents and did not fund any of the loans that were in the batch. . . . To date, we have not received any refunds from the lender, which when received we would forward to you."

124.

The following interstate wire communications were used to defraud the Cofers in violation of 18 U.S.C. § 1343 and constitute predicate acts of racketeering activity under 18 U.S.C. § 1961:

A. July 20, 2012 email from Mr. O'Neil to Mr. Smallwood of American Eagle with Mr. Enrico's directions for a refund.

B. August 9, 2012 email from Ms. Kirkland of SCS to Mr. Cofer stating, "August 13 is the deadline that the lender has to send out closing packages, not for anyone to close on that date. There are a lot of closing packages going out then in batches of 50 to the agencies doing the closings. Actual

closings will be after the 13th."

C.  August 16, 2012 email from Ms. Kirkland, with Mr. O'Neil's electronic signature, to Mr. Cofer stating, "We have been trying very hard, working with the primary lender every day, on getting closing packages out. Today the lender told us that no loan packages are going out this week because they had to replace the secondary lender. So, the new lender has to work through the packages to satisfy their guidelines before allowing any to transmit to closers. The best we are hoping for is a date for next week."

D.  September 6, 2012 email from Ms. Kirkland of SCS to Mr. Cofer promising that the loan would close soon: "Per the lender, the HUD statements and closing pkgs./funding are on schedule. We are waiting to hear from the lender on the HUD transmittals. Will advise as soon as I hear update."

125.

The predicate acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

126.

The Count VI Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

127.

As a direct and proximate result of the Count VI Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), the Cofers have been injured in their business and property in that: (1) they were unable to secure private funding for the purchase of the Property; (2) the Cofers were unable to purchase that Property; (3) to wit the Cofers suffered damages of $75,000.00; (4) the Cofers lost their $2,000.00 earnest money deposit; and, (5) the Cofers paid the Fee of $3,500.00, which was never returned to the Cofers. The Cofers are entitled to treble damages.

## COUNT VII
### VIOLATION OF RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
### AGAINST RAY MCNEIL, LINDA KIRKLAND, ARTHUR GEISS, SCOTT O'NEIL, GAYLIN WARE, TOTAL CHOICE CORP., Doe Defendants 1-5, KENNETH ENRICO
### [PURSUANT TO 18 U.S.C. § 1962(c)]

128.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

129.

SCS, American Eagle, and The Enrico Corp. consist of an enterprise engaged in and whose activities affect interstate commerce. The Count VII Defendants are employed by or associated with the enterprise.

130.

The Count VII Defendants agreed to and did voluntarily conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding the Cofers.

131.

Pursuant to and in furtherance of their fraudulent scheme, the Count VIII Defendants committed multiple related acts of mail fraud and wire fraud.

132.

It was reasonably foreseeable that interstate mail and wire communications would be used in furtherance of the enterprise's affairs.

133.

The following interstate mail communications were used to defraud the Cofers in violation of 18 U.S.C. § 1341 and constitute predicate acts of racketeering activity under 18 U.S.C. § 1961:

A. Transmission of the Cofers' loan application and Fee by American Eagle and Mr. Smallwood to Mr. Geiss, Ms. Kirkland, and Mr. O'Neil on February 29, 2012.

B. Transmission of the Cofers' loan application and Fee by Mr. Geiss, Ms. Kirkland, and Mr. O'Neil to Kenneth Enrico and The Enrico Corp. on

February 29, 2012.

C.  Pre-Approval Letter for the Cofers' loan to purchase the Property sent by Mr. O'Neil of SCS to the Cofers in March 2012.

D.  May 25, 2012 letter from Mr. O'Neil of SCS to the Cofers stating that The Enrico Corp. "just informed us that the recent issues with property values and appraisals that caused for delay have been addressed." The letter further stated that an exact closing date would be provided to the Cofers and asked the Cofers not to call SCS.

E.  June 21, 2012 letter from Mr. O'Neil of SCS to the Cofers stating, "The updates are almost done and with luck will all be completed tomorrow and sent to the secondary investors attorneys. They have said they will need a couple of days to review & confirm. At that point the lender will send out closing packages. This will take us into early next week and then the packages will go out."

F.  June 28, 2012 letter from Mr. O'Neil to the Cofers stating that the Cofers' closing had not occurred because of complications with the appraisal updates - specifically, that "many were sent with a request for additional information." The letter again directed that all communications with SCS be via email.

G. June 29, 2012 letter from Mr. O'Neil to the Cofers stating, "All the obstacles that required the appraisal and title updates have been resolved and today are being sent to the secondary investors." The letter again directed that all communications with SCS be via email.

H. July 12, 2012 letter from Mr. O'Neil to the Cofers with a written "update" stating, "The lender has informed me that all of the applications and associated properties have gone through final review and approval. This means that all of the obstacles and issues that have previously delayed this process have been resolved. The secondary investors, lawyers and staff will begin preparing all of the loan closing documents at the beginning of the next week."

I. July 20, 2012 letter from SCS to the Cofers blaming the further delay on "valuation issues on some of the files," and stating that the loan packages that were to "go out July 16th and July 17th" were delayed because of the "large volume."

J. July 27, 2012 letter from Mr. O'Neil to the Cofers promising that the loans would close "on or about the 13th of August," and as concession for the delay, Mr. O'Neil stated that "the lender has reduced the mortgage interest from 4.99% to 3.5% fixed rate 30 year mortgage." Mr. O'Neil concluded his July 27, 2012 letter by again requesting that the loan applicants not call SCS; "If you need me [sic] one of our staff to talk to your sellers please send an

email to [linda@scsprivatefunding.com](mailto:linda@scsprivatefunding.com), please refrain from calling we are not quipped to handle calls."

K. Second July 27, 2012 letter from Mr. O'Neil to the Cofers, promising that the loans would close "during the week of August 13, 2012."

L. August 22, 2012 letter from Mr. O'Neil to the Cofers stating, "HUD statements will be sent out the 6th and 7th of September. Closing documents will be sent out the 10th, 11th, and 12th of September."

M. September 12, 2012 letter from SCS to the Cofers stating, "We have been informed by the lender that the documents we were expecting on the 10th, 11th and 12th of this month will not go out until the 28th of September, 2012."

N. October 4, 2012 letter from Mr. O'Neil of SCS to the Cofers acknowledging that the Cofers' Fee has been improperly retained: "In a letter dated September 12, 2012, I conveyed to you the lender's announcement that your loan documents would arrive on or before the 28th of September, 2012 or that they would refund you the processing fees. The lender did not send out any loan documents and did not fund any of the loans that were in the batch. . . . To date, we have not received any refunds from the lender, which when received we would forward to you."

134.

The following interstate wire communications were used to defraud the Cofers in violation of 18 U.S.C. § 1343 and constitute predicate acts of racketeering activity under 18 U.S.C. § 1961:

A. July 20, 2012 email from Mr. O'Neil to Mr. Smallwood of American Eagle with Mr. Enrico's directions for a refund.

B. August 9, 2012 email from Ms. Kirkland of SCS to Mr. Cofer stating, "August 13 is the deadline that the lender has to send out closing packages, not for anyone to close on that date. There are a lot of closing packages going out then in batches of 50 to the agencies doing the closings. Actual closings will be after the 13th."

C. August 16, 2012 email from Ms. Kirkland, with Mr. O'Neil's electronic signature, to Mr. Cofer stating, "We have been trying very hard, working with the primary lender every day, on getting closing packages out. Today the lender told us that no loan packages are going out this week because they had to replace the secondary lender. So, the new lender has to work through the packages to satisfy their guidelines before allowing any to transmit to closers. The best we are hoping for is a date for next week."

D. September 6, 2012 email from Ms. Kirkland of SCS to Mr. Cofer promising that the loan would close soon: "Per the lender, the HUD statements and closing pkgs./funding are on schedule. We are waiting to hear from the lender on the HUD transmittals. Will advise as soon as I hear update."

135.

The predicate acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

136.

The Count VII Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

137.

As a direct and proximate result of the Count VII Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), the Cofers have been injured in their business and property in that: (1) they were unable to secure private funding for the purchase of the Property; (2) the Cofers were unable to purchase that Property; (3) to wit the Cofers suffered damages of $75,000.00; (4) the Cofers lost their $2,000.00 earnest money deposit; and, (5) the Cofers paid the Fee of $3,500.00, which was never returned to the Cofers. The Cofers are entitled to treble damages.

## COUNT VIII
## VIOLATION OF RACKETEER INFLUENCED AND CORRUPT
## ORGANIZATIONS ACT
## AGAINST ALL DEFENDANTS
## [PURSUANT TO 18 U.S.C. § 1962(d)]

138.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

139.

As set forth above, Defendants agreed and conspired to violate 18 U.S.C. §§ 1962(b) and (c). Specifically, SCS, American Eagle, Mr. Enrico, and The Enrico Corp. acquired or maintained an interest in the enterprise through a pattern of racketeering activity, and Ms. Kirkland, Mr. Geiss, Mr. O'Neil, Total Choice, Mr. McNeil, Mr. Ware, and Doe Defendants 1-5 conducted or participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

140.

Defendants have intentionally conspired and agreed to acquire or maintain interests in the enterprise through a pattern of racketeering activity and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

141.

Pursuant to and in furtherance of the conspiracy, the Count VIII Defendants committed multiple related acts of mail fraud and wire fraud.

142.

It was reasonably foreseeable that interstate mail and wire communications would be used in furtherance of the conspiracy.

143.

The following interstate mail communications were used to defraud the Cofers in violation of 18 U.S.C. § 1341 and constitute predicate acts of racketeering activity under 18 U.S.C. § 1961:

A. Transmission of the Cofers' loan application and Fee by American Eagle and Mr. Smallwood to Mr. Geiss, Ms. Kirkland, and Mr. O'Neil on February 29, 2012.

B. Transmission of the Cofers' loan application and Fee by Mr. Geiss, Ms. Kirkland, and Mr. O'Neil to Kenneth Enrico and The Enrico Corp. on February 29, 2012.

C. Pre-Approval Letter for the Cofers' loan to purchase the Property sent by Mr. O'Neil of SCS to the Cofers in March 2012.

D. May 25, 2012 letter from Mr. O'Neil of SCS to the Cofers stating that The Enrico Corp. "just informed us that the recent issues with property values

and appraisals that caused for delay have been addressed." The letter further stated that an exact closing date would be provided to the Cofers and asked the Cofers not to call SCS.

E. June 21, 2012 letter from Mr. O'Neil of SCS to the Cofers stating, "The updates are almost done and with luck will all be completed tomorrow and sent to the secondary investors attorneys. They have said they will need a couple of days to review & confirm. At that point the lender will send out closing packages. This will take us into early next week and then the packages will go out."

F. June 28, 2012 letter from Mr. O'Neil to the Cofers stating that the Cofers' closing had not occurred because of complications with the appraisal updates - specifically, that "many were sent with a request for additional information." The letter again directed that all communications with SCS be via email.

G. June 29, 2012 letter from Mr. O'Neil to the Cofers stating, "All the obstacles that required the appraisal and title updates have been resolved and today are being sent to the secondary investors." The letter again directed that all communications with SCS be via email.

H. July 12, 2012 letter from Mr. O'Neil to the Cofers with a written "update" stating, "The lender has informed me that all of the applications and associated

properties have gone through final review and approval. This means that all of the obstacles and issues that have previously delayed this process have been resolved. The secondary investors, lawyers and staff will begin preparing all of the loan closing documents at the beginning of the next week."

I.   July 20, 2012 letter from SCS to the Cofers blaming the further delay on "valuation issues on some of the files," and stating that the loan packages that were to "go out July 16th and July 17th" were delayed because of the "large volume."

J.   July 27, 2012 letter from Mr. O'Neil to the Cofers promising that the loans would close "on or about the 13th of August," and as concession for the delay, Mr. O'Neil stated that "the lender has reduced the mortgage interest from 4.99% to 3.5% fixed rate 30 year mortgage." Mr. O'Neil concluded his July 27, 2012 letter by again requesting that the loan applicants not call SCS; "If you need me [sic] one of our staff to talk to your sellers please send an email to [linda@scsprivatefunding.com](mailto:linda@scsprivatefunding.com), please refrain from calling we are not quipped to handle calls."

K.   Second July 27, 2012 letter from Mr. O'Neil to the Cofers, promising that the loans would close "during the week of August 13, 2012."

L.   August 22, 2012 letter from Mr. O'Neil to the Cofers stating, "HUD statements will be sent out the 6th and 7th of September. Closing documents

will be sent out the 10th, 11th, and 12th of September."

M. September 12, 2012 letter from SCS to the Cofers stating, "We have been informed by the lender that the documents we were expecting on the 10th, 11th and 12th of this month will not go out until the 28th of September, 2012."

N. October 4, 2012 letter from Mr. O'Neil of SCS to the Cofers acknowledging that the Cofers' Fee has been improperly retained: "In a letter dated September 12, 2012, I conveyed to you the lender's announcement that your loan documents would arrive on or before the 28th of September, 2012 or that they would refund you the processing fees. The lender did not send out any loan documents and did not fund any of the loans that were in the batch. . . . To date, we have not received any refunds from the lender, which when received we would forward to you."

144.

The following interstate wire communications were used to defraud the Cofers in violation of 18 U.S.C. § 1343 and constitute predicate acts of racketeering activity under 18 U.S.C. § 1961:

A. July 20, 2012 email from Mr. O'Neil to Mr. Smallwood of American Eagle with Mr. Enrico's directions for a refund.

B. August 9, 2012 email from Ms. Kirkland of SCS to Mr. Cofer stating, "August 13 is the deadline that the lender has to send out closing packages, not for anyone to close on that date. There are a lot of closing packages going out then in batches of 50 to the agencies doing the closings. Actual closings will be after the 13th."

C. August 16, 2012 email from Ms. Kirkland, with Mr. O'Neil's electronic signature, to Mr. Cofer stating, "We have been trying very hard, working with the primary lender every day, on getting closing packages out. Today the lender told us that no loan packages are going out this week because they had to replace the secondary lender. So, the new lender has to work through the packages to satisfy their guidelines before allowing any to transmit to closers. The best we are hoping for is a date for next week."

D. September 6, 2012 email from Ms. Kirkland of SCS to Mr. Cofer promising that the loan would close soon: "Per the lender, the HUD statements and closing pkgs./funding are on schedule. We are waiting to hear from the lender on the HUD transmittals. Will advise as soon as I hear update."

145.

The predicate acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

146.

Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts in furtherance of the schemes described above.

147.

Defendants conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(b) and (c) in violation of 18 U.S.C. § 1962(d).

148.

As a direct and proximate result of Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), the Cofers have been injured in their business and property in that: (1) they were unable to secure private funding for the purchase of the Property; (2) the Cofers were unable to purchase that Property; (3) to wit the Cofers suffered damages of $75,000.00; (4) the Cofers lost their $2,000.00 earnest money deposit; and, (5) the Cofers paid the Fee of $3,500.00, which was never returned to the Cofers.

149.

The Cofers are entitled to treble damages.

**COUNT IX**
**VIOLATION OF THE FAIR BUSINESS PRACTICES ACT**
**AGAINST SCS, THE ENRICO GROUP, AND AMERICAN EAGLE**
**[PURSUANT TO O.C.G.A. § 10-1-393]**

150.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

151.

Defendants used unfair or deceptive acts or practices in the conduct of the consumer transaction in which the Fee was exchanged for a promise to secure private funding.

152.

Defendants caused actual misunderstanding as to the source, sponsorship, approval, or certification of the private funding.

153.

Defendants' conduct constitutes an unfair business practice in violation of O.C.G.A. § 10-1-393.

154.

As a direct and proximate result of Defendants' conduct, the Cofers have been damaged in an amount presently unknown but to be set forth at the time of trial, but at least the amount of the Fee ($3,500.00), earnest money deposit ($2,000.00), and lost

profits ($75,000.00). In addition the Cofers are entitled to recovery of interest on past due monies.

155.

The Cofers are entitled to treble or punitive damages.

**COUNT X**
**VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT**
**AGAINST SCS, THE ENRICO GROUP, AND AMERICAN EAGLE**
**[PURSUANT TO O.C.G.A. § 10-1-372]**

156.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

157.

Defendants knowingly misrepresented to the Cofers that they would secure private funding for the Cofers' purchase of the Property in exchange for the Fee.

158.

Defendants failed to secure private funding and never returned the Fee to the Cofers.

159.

Defendants' representations to the Cofers' regarding Defendants' service of securing private funding constituted a representation that those services had sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they did not have.

160.

Defendants' conduct caused a likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of the private funding.

161.

Defendants' conduct constitutes a deceptive trade practice in violation of O.C.G.A. § 10-1-372.

162.

As a direct and proximate result of the conduct of Defendants keeping the Cofers' Fee and purposefully failing to secure private funding, the Cofers have been damaged in an amount presently unknown but to be set forth at the time of trial, but at least the amount of the Fee ($3,500.00), earnest money deposit ($2,000.00), and lost profits ($75,000.00). In addition the Cofers are entitled to recovery of interest on past due monies.

163.

The Cofers are entitled to treble or punitive damages.

## COUNT XI
## ATTORNEY'S FEES AND EXPENSES AND COSTS OF LITIGATION
## [PURSUANT TO 18 U.S.C. § 1964]

164.

Plaintiffs restate the allegations contained in paragraphs 1 to 79 and incorporate those allegations as though set forth in full in this cause of action.

165.

18 U.S.C. § 1964 authorizes this Court to award reasonable attorney's fees and costs of action to either party in a RICO action.

166.

As a result of the actions and failings of Defendants, Plaintiffs have retained the services of legal counsel for prosecuting this action.

167.

Plaintiffs therefore request an award of reasonable attorney's fees, expenses and the costs of litigation.

## PRAYER FOR RELIEF

For these reasons set forth above, the Cofers pray for the following relief:

i.      The Court award a judgment in Plaintiffs' favor against Defendants.

ii.     The Court order Defendants to pay treble damages to the Cofers pursuant to 18

U.S.C. § 1964 and Counts VI, VII, and VII.

iii.  The Court award punitive damages to the Cofers pursuant to Counts II, III, and IV.

iv.  The Court aware other available special remedies provided by law pursuant to Counts II, IX, and X.

v.  The Court order Defendants to pay accrued prejudgment interest through the date of the judgment at the Georgia statutory rate for prejudgment interest.

vi.  The Court order payment to Plaintiffs their reasonable attorneys' fees, expenses, and the costs of litigation incurred in this action pursuant to 18 U.S.C. § 1964 and/or O.C.G.A. § 13-6-11.

vii.  The Court order such other and further legal and/or equitable relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,

**Shenton Law, P.C.**

/s/ Gregory O. Shenton_____
  Gregory O. Shenton
  Georgia Bar No. 640943

The Stephens Building
145 Church St. NE, Suite 290
Marietta, Georgia  30060
greg@shentonandsonoda.com
678-290-6530 (phone)
678-290-6531 (fax)